**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

**KENNETH JAMES BEAUCHAMP,** *

**Petitioner,** *

**v.** * **Civil Action No. PWG-14-603**

**J. MICHAEL STOUFFER, *et al.*,** *

**Respondents.** *

***

**MEMORANDUM**

In this Court's Memorandum and Order dated February 20, 2015, Respondents J. Michael Stouffer and the Attorney General of the State of Maryland were directed to supplement the record with the full record of state proceedings pertaining to Petitioner Kenneth Beauchamp's September 5, 2008 murder conviction in the Circuit Court for Baltimore County. ECF Nos. 16 and 17. Respondents filed the record, along with a Supplemental Answer, ECF Nos. 21, 21-1, and Petitioner has filed a Reply, ECF No. 22, as well as a Response to the Memorandum and Order, ECF No. 23. The Court finds no need for an evidentiary hearing to resolve the issues pending before it. *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts* and Local Rule 105.6 (D. Md. 2014); *see also Fisher v. Lee*, 215 F. 3d 438, 455 (4th Cir. 2000) (petitioner not entitled to a hearing under 28 U.S.C. § 2254(e)(2)). Because Beauchamp's claims, to the extent they are exhausted, are without merit and do not state a basis for federal habeas relief, his Petition will be denied.

**Background**[1]

State Court Proceedings

On September 5, 2008, Petitioner was tried and convicted of first-degree murder in the Circuit Court for Baltimore County. State Ct. Docket, Resp. Ex. 1, ECF No. 3-1. Petitioner was sentenced to serve a life sentence, with all but fifty-five years suspended. *Beauchamp v. Maryland*, No. 2390, at 1 (Md. Ct. Spec. App. Aug. 10, 2010) (unreported), Resp. Ex. 5, ECF No. 3-5. The following evidence was produced at trial:

> On the afternoon of August 30, 2007, police found the body of Patrick Pearce lying under a pile of trash on Todd's Lane, which [Beauchamp] describes as a "dirt road" in Baltimore County. An autopsy determined that Pearce's cause of death was a small-caliber bullet wound to his chest. [Beauchamp] was later charged with Pearce's murder.
>
> At trial, the State and the defense presented several witnesses . . . . [Beauchamp] was convicted of first-degree murder after the following evidence was presented at trial.
>
> On the morning of August 26, 2007, [Beauchamp] drove his sports utility vehicle to pick up Pearce purportedly "to price a job[] and go to Wal-Mart." Before going to either destination, [Beauchamp] stopped at a convenience store so that Pearce could buy cigarettes and a drink. According to a statement appellant eventually gave to police, once Pearce returned to the vehicle, [Beauchamp] turned left out of the store's parking lot to continue on the way to the potential job site. Instead, video footage from the store's surveillance camera showed [Beauchamp] turning right out of the parking lot, which put him in the direction of the scene of the murder.
>
> As the two drove away from the convenience store, Pearce received a telephone call from his fiancée, Tammy Fisher. During that call, when asked where they were, both Pearce and [Beauchamp] simply told Fisher that they were driving on a "country road." Later that afternoon, [Beauchamp] told Fisher that he left Pearce at Wal-Mart so that appellant could run some personal errands. However, a subsequent review of the Wal-Mart's security cameras did not corroborate [Beauchamp's] story because there was no video evidence of [Beauchamp's] vehicle in the Wal-Mart parking lot or of Pearce

[1] The Background from the February 20, 2015 Memorandum is restated here for the reader's convenience and expanded upon based on the parties' more recent filings.

> entering the store. At around four o'clock that afternoon, Fisher reported Pearce missing when he failed on several occasions to answer his cell phone.
>
> Four days later, Pearce's body was found under a pile of trash on Todd's Lane, which, as noted, [Beauchamp] describes in his brief as a "dirt road." A subsequent police investigation determined that Pearce had likely been dead for three to four days before his body was found. He was also found in the same clothes that he was wearing on the day he was reported missing. A cigarette butt with [Beauchamp's] DNA was found approximately twenty-five feet from Pearce's body, and cell phone records disclosed that [Beauchamp] and Pearce were likely near Todd's Lane when Pearce received the phone call from Fisher. In addition, police recovered other evidence from the scene of the murder that was substantially similar to items found near [Beauchamp's] temporary residence, including some corrugated plastic sheeting and fairly distinctive cardboard shipping boxes (only 208 such boxes were ever manufactured).

*Id.* at 1-3 (footnote omitted).

Fisher also testified that she had an on and off sexual relationship with Beauchamp that had ended when she became engaged to Pearce. Sept. 3, 2008 Tr. 15–16, Supp. Answer Ex. 12. Fisher testified that Beauchamp was "very distraught" and "very upset" when she told him she was going to marry Pearce. *Id*. at 20–21. It was also established through Fisher's direct testimony that she suffers from multiple personality disorder wherein she takes on the persona of different "people" or alter-egos who live within her mind and that she is a drug addict and recovering alcoholic. *Id*. at 17–19. Given her severe mental illness, her competence to testify was challenged by defense counsel prior to the State putting Fisher on the stand, but the motion was denied by the trial judge who observed that there was no legal reason her mental illness prevented her from testifying and that her demeanor went to her credibility, which was an issue for the jury to determine. Sept. 3, 2008 Tr. 11–13.

Fisher explained that Beauchamp had told her he left Pearce at the Wal-Mart store in the afternoon of August 26, which concerned her because Pearce was legally blind and had no way to get home. Sept. 3, 2008 Tr. 24. Fisher further stated Pearce was not answering his phone

when she attempted to call him several times that day, which was not his habit. Sept. 3, 2008 Tr. 26, 44. She stated that Beauchamp also called her numerous times ("about fifteen times in an hour almost") asking if Pearce had been to Fisher's house. Sept. 3, 2008 Tr. 25, 60. She filed a report with the police at approximately 4:30 that afternoon regarding Pearce's absence and provided a description of Pearce and what he was wearing to police. Sept. 3, 2008 Tr. 26, 42. That same day, Fisher asked Beauchamp to drive her to several locations in and near Baltimore City in an attempt to locate Pearce. *Id*. at 27. Fisher stated during cross examination that, on August 29, she and Beauchamp went to Hampden, a neighborhood in Baltimore City, to look for Pearce; they "went to a bar called Zizmo's on 36th Street and [Fisher] went inside the bar and showed pictures and nobody seen him," but a man outside the bar said that he had seen him. Sept. 3, 2008 Tr. 62–64. She confirmed through review of her police interview that the man she had spoken to was Billy Warren and testified that she had provided that information to the police detective assigned to the case. *Id*. at 64.

In further cross-examination of Fisher, counsel established that on the day of Pearce's disappearance she rode to a Narcotics Anonymous ("N.A.") meeting with Mary Steinhice. Sept. 3, 2008 Tr. 45–46. Fisher did not remember making a statement to Steinhice that "you could hide a body off of Route 40" and denied that any of three of her other personalities would have said something to that effect. *Id*. at 51–53.

On August 30, 2007, Pearce's body was found on Todds Lane lying beneath a pile of trash that had been dumped there; he was wearing clothes matching those described by Tammy Fisher when she reported him missing. Pearce's body was found in the evening and, due to the loss of daylight, the police had to secure the scene overnight and continue the search for

evidence the following day. Sept. 3, 2008 Tr. 147–48, 155, 196-97; Sept. 4, 2008 Tr. 100–09, Supp. Answer Ex. 13.

"[S]everal trash bags" were present at the scene where Pearce's body was found. Sept. 3, 2008 Tr. 150. They were removed from the scene, taken back to the police station, and placed in a "drying locker" for purposes of searching through the trash for possible evidence. *Id*. at 150–51. Officer Terrence Kreitz of the forensic services section for the Baltimore County Police Department Crime Lab testified that the trash contained in the bags collected was "eventually" sorted through, but the only thing found and kept were "some shotgun shells and some money." *Id*. at 151–52. Kreitz admitted that some of the trash had been moved before the scene was photographed, but explained it was necessary "to get to the body." *Id*. at 166–67, 173.

At the direction of detectives assigned to investigate the murder, Kreitz collected two black corrugated plastic sheets from the location where Pearce was found, which were introduced as evidence in the case. *Id*. at 155–57. A second evidence technician testified to collection of black plastic sheeting near the pop-up trailer where Beauchamp lived, as well as a cigarette pack and cardboard boxes similar to those found near Pearce's body. *Id*. at 178–84. This technician also testified to collecting cardboard boxes[2] at the crime scene. *Id*. at 185–89. A third forensic technician testified to collection of "a pair of glasses with a broken lens" and a cigarette butt found at the scene, both of which were collected on August 31, the day after Pearce was found. *Id*. at 197–98.

[2] The cardboard boxes were connected to Beauchamp through testimony of an employee from the Willard Packaging Corporation who explained that only 208 boxes matching those found at the scene were manufactured by his company and they had been shipped to a company called Hydrotherm located in Dundalk, Maryland where Beauchamp lived. Sept. 4, 2008 Tr. 3–9.

Laura Pawlowski, a forensic biologist with the Baltimore County Police Department, testified regarding the testing of the cigarette butt found at Todds Lane and stated it was positive for the presence of saliva. Sept. 3, 2008 Tr. 215–16. Linda Watson, a forensic supervisor with the Baltimore County Police Department, testified as to the DNA testing performed on the cigarette butt. Sept. 4, 2008 Tr. 70–82. Watson did not perform the actual DNA test; another lab technician who no longer worked there performed the test. *Id*. at 78–79. DNA profiles from Pearce and Beauchamp were compared with the DNA in the saliva found on the cigarette butt. *Id*. at 80. Pearce was excluded as the source, and Beauchamp was found to be a match. *Id*. Watson testified that the frequency of the genetic profile found to match Beauchamp "in the Caucasian population is one in thirty-five quadrillion." *Id*. at 82.

Officer Kreitz testified during cross-examination that various items containing the name David Shuler were found among the trash collected as well as shotgun shells, a knife, a box of gun cleaning patches, a pack of Gold Brand cigarettes and a pack of Newport cigarettes. Sept. 3, 2008 Tr. 160–63. He explained that he and Detective Massey went through the trash collected and "if we found anything we thought was of evidentiary value, we saved it." *Id*. at 164, *see also id.* at 165-74. Much of the trash collected at the scene was discarded as irrelevant as it had no connection to Beauchamp, who had been identified as a suspect, or Pearce. Detective Massey discarded a vehicle emissions notice with a name and address on it as well as correspondence from a law firm to another individual, because they were not relevant to the investigation. *See* Sept. 5, 2008 Tr. 40–42, Supp. Answer Ex. 14.

Detective Massey was the lead investigator in the case and testified as to the processing of the crime scene and his interviews of both Tammy Fisher and Beauchamp. Sept. 4, 2008 Tr. 97–178. After Pearce was identified through reference to the missing person's report filed by

Tammy Fisher, Massey went to Fisher's apartment to interview her. *Id*. at 112. Beauchamp was at Fisher's apartment when he arrived and both Fisher and Beauchamp went to the police station voluntarily for interviews. *Id*. at 111–13.

During his interview, Beauchamp maintained that he had dropped Pearce off at Wal-Mart because he wanted to buy a universal remote for a television set. *Id*. at 120, 122. Massey asked Beauchamp to describe in detail the route he took while Beauchamp was in the truck and provided a map for Beauchamp to indicate where the two went. *Id*. at 131–32. During the course of describing where the two went, Beauchamp said they went to a Royal Farms store before going to Wal-Mart and that he had turned left leaving the parking lot to get to the area where Wal-Mart was located. *Id*. at 132.

Massey testified that he viewed surveillance camera video from the Royal Farms store, a storage facility where Beauchamp had a unit, and the Wal-Mart parking lot to verify Beauchamp's statements. Sept. 4, 2008 Tr. 143–44, 150–52. Upon viewing the video from Royal Farms, Massey found footage of Beauchamp's truck pulling into the parking lot and of Pearce inside the store making a purchase. *Id*. at 144–45. Another camera angle of the parking lot showed Beauchamp's car leaving the parking lot and taking a right turn, not the left turn that Beauchamp previously had stated. *Id*. at 148–50.

The video of the storage facility depicts Beauchamp arriving on the afternoon after the morning Massey interviewed him, wearing the same clothing he had on during the interview. Sept. 4, 2008 Tr. 151. Beauchamp is seen leaving the facility carrying three to four bags. *Id*. at 152. No evidence was introduced regarding the content of those bags. Beauchamp left Maryland after Massey interviewed him and later was arrested in Columbus, Ohio.

Massey limited his view of the video footage of the Wal-Mart parking lot to a time frame of 10:45 a.m. to 12:51 p.m., based on the times noted on the video of the Royal Farms store where both Pearce and Beauchamp's vehicle were seen. Sept. 4, 2008 Tr. 154–57. Massey stated he looked at video from camera angles that captured the front parking lot where Beauchamp claimed he had left Pearce. *Id*. at 157. Massey stated that while there were several sports utility vehicles that looked like Beauchamp's sports utility vehicles, no one matching Pearce's description got out of those vehicles. *Id*. at 158.

Beauchamp's trial counsel brought out during cross examination of Massey that this was his second or third murder investigation; that trash bags found on top of the body were not processed for fingerprints or other latent evidence; that people whose names were on documents found around the crime scene and inside the trash bags were not interviewed;[3] that his search for Billy Warren was not vigilant; and a teletype to Ohio seeking assistance in arresting Beauchamp indicated the murder weapon was a shotgun.[4] Sept. 5, 2008 Tr. 16–37. Massey also could not say definitively whether the Wal-Mart where Pearce was allegedly dropped off had another entrance through the garden center. *Id*. at 24–25. Massey was questioned as to whether the maggots found on the victim's body had been preserved and admitted knowing that certain tests on maggots could establish a precise time of death. *Id*. at 28–30.

3 Counsel testified at the post-conviction hearing that his trial strategy with respect to the discarded items of trash was that it was possible evidence and discarding it was sloppy police work. Dec. 16, 2001 Tr. 23 – 24, Supp. Answer Ex. 16.

4 Massey indicated that the shotgun notation on the teletype was a misprint. Sept. 5, 2008 Tr. 37–38.

An exact time of death for Pearce was never established at trial. Rather, the medical examiner, Dr. Russell Alexander,[5] estimated that Pearce died from a single gunshot wound to his chest and that he had been dead for three to four days before he was found. Sept. 3, 2008 Tr. 116–20, 124. The estimate was made on the degree of decomposition to the body and large presence of maggots in the body. *Id*. at 118–20.

Cross-examination of Dr. Alexander focused on the State's failure to order tests on the maggots found in Pearce's body to establish a more precise time of death. Sept. 3, 2008 Tr. 132–35. There was conflicting testimony presented as to whether any of the maggots had been collected and sent to the medical examiner's office for that purpose. *Id*. at 134.

In the defense's case-in-chief, counsel called to the stand Mary Steinhice, Billy Warren, and Jeffrey Kaplan, a law clerk who had worked for the public defender's office the summer before Beauchamp stood trial. Steinhice testified she gave Tammy Fisher a ride to N.A. and that Fisher had said that the area off of Pulaski Highway would be "a good place to hide a body." Sept. 5, 2008 Tr.70–76. Steinhice also testified that she had offered to take Fisher to the Wal-Mart to look for Pearce, but Fisher declined the offer. *Id*.

Billy Warren, whom Massey claimed he could not locate because he only had the name and nothing else, testified that he recalled seeing Pearce alive at Zismo's, a bar in Hampden, the day after he allegedly was killed. Sept. 5, 2008 Tr. 77–85. Warren was certain it was Pearce he saw because he knew Pearce and spoke with him briefly. *Id*. at 80–81.

Jeffrey Kaplan testified that he viewed approximately ten hours of video surveillance from the Wal-Mart store which included five camera angles and kept a detailed log of each time

[5] Dr. Alexander did not perform the autopsy. Dr. Zabiullah Ali performed the actual autopsy but was unavailable to testify. Sept. 3, 2008 Tr. 115–16. The autopsy report was admitted into evidence by stipulation. *Id*. at 103–04.

a vehicle appeared in the parking lot that could have been Beauchamp's red Ford Explorer. Sept. 5, 2008 Tr. 86–93. He testified that there were over fifty instances where a vehicle matching that general description could be seen; the camera angles were such that some details on the vehicles coming into the parking lot could not be seen; and there was no way to verify or dispute that Pearce had entered that store, as there were just too many people coming in or leaving. *Id*.

Upon the close of evidence, the trial court instructed the jury. Sept. 5, 2008 Tr. 117–26. Defense counsel raised an objection to the pattern jury instruction given regarding flight, arguing that the evidence did not support such an instruction because Beauchamp did not leave the jurisdiction right after the crime was committed, and he had not been charged with the crime when he left for Ohio. *Id*. at 126–27. The state countered that Beauchamp's flight after being question by the police and the fact he left his car in police custody without reclaiming it before he left for Ohio supported a flight instruction. *Id*. at 127. The trial court overruled the objection, finding that the term "accused of a crime" as found in the pattern instruction was not intended to mean only when the defendant had been formally tried and that the evidence in the case was such that a reasonable trier of fact could find that Beauchamp's actions following Massey's questioning could be considered flight. *Id*. at 128.

In closing argument, defense counsel capitalized on Detective Massey's inexperience and suggested Massey determined that Beauchamp had killed Pearce twelve hours after the body was found. Sept. 5, 2008 Tr. 155–56. Counsel also pointed out perceived discrepancies between testimony regarding the evidence collected at the scene where the body was found and the crime scene photos. *Id*. at 158–59. Specifically, counsel pointed out that the daylight picture of the crime scene did not depict the cardboard boxes and the black plastic police claimed matched items found near Beauchamp's temporary residence. *Id*. at 160–61. Counsel theorized that the

trash bags on top of Pearce's body appeared to be too carefully placed there, but police conducted no fingerprint or DNA tests on those items. *Id*. at 162. Additionally, counsel reminded the jury there had been no time of death established despite the availability of tests for the maggots found inside the body to more accurately define how long Pearce had been dead. *Id*. at 164–66.

The State's Attorney argued in rebuttal closing that the defense's theory that Billy Warren had seen Pearce the day after he was reported missing was refuted by the first witness to take the stand, Earl Davies. Sept. 5, 2008 Tr. 181–82. Mr. Davies lived in the area of Todds Lane where Pearce's body was found and testified that the first two days after Pearce was reported missing, his dog came back "smelling like death" and by the third day the smell was detectible upon leaving his house. *Id*. The jury was excused and later that day returned a verdict of guilty as to first degree murder. Sept. 5, 2008 Tr. 188.

On December 16, 2008, after hearing victim impact statements from Pearce's mother and Tammy Fisher, the court imposed a sentence of life, with all but 55 years suspended. Dec. 16, 2008 Tr. Tr. 30, Supp Answer Ex. 15. Beauchamp was advised of his appellate rights following sentencing. *Id*. at 30–32.

Beauchamp appealed his judgment of conviction to the Court of Special Appeals. Br. for Appellant 2, Resp. Ex. 2, ECF No. 3-2. On August 10, 2010, in an unpublished but thorough opinion, the Court of Special Appeals of Maryland affirmed petitioner's judgment of conviction; the mandate issued on September 9, 2010. *Beauchamp*, No. 2390, Mandate, Resp. Ex. 5, ECF No. 3-5, at 15. Petitioner did not seek further review in the Maryland Court of Appeals. Habeas Pet. 7, ECF No. 1.

Petitioner instituted state post-conviction proceedings on January 25, 2011 without counsel. He raised the following claims:

> (A) trial counsel was ineffective for (1) failing to confront cigarette butt evidence, (2) failing to argue the importance of evidence collection, chain of custody, and disposal/destruction of potentially exculpatory evidence, (3) failing to prevent Tammy Fisher from testifying, (4) failing to object to a confrontation violation; (5) failing to argue the motion for judgment of acquittal with particularity, (6) failing to object to the State's improper remarks during closing, and (7) failing to preserve meritorious issues for appellate review; (B) the trial court abused its discretion by issuing unwarranted instructions on flight; (C) the police did not view all angles of the surveillance cameras of the Wal-Mart parking lot; (D) the State committed misconduct by misstating the evidence and misleading the jury; and (E) his right to confront witnesses was violated.

Post-Conviction Op. 2–3, *Beauchamp v. Maryland*, No. 03-K-07-4687 (Cir. Ct. for Balt. Cnty. Dec. 21, 2011), Resp. Ex. 6, ECF No. 3-6.

A hearing on Beauchamp's post-conviction petition was held on December 16, 2011 in the Circuit Court for Baltimore County. Beauchamp, represented at the hearing by counsel provided by the Maryland Public Defender's office, testified to clarify the issues he had raised in the petition. Dec. 16, 2011 Tr. 4–20, Supp. Answer Ex. 16.

With regard to his first claim, Beauchamp testified that trial counsel was ineffective because he failed to argue that the DNA analysis on the cigarette butt allegedly found at the crime scene was inconclusive because there was no evidence presented about the brand of cigarettes Beauchamp smoked, even though police reports stated that empty cigarette packs of another brand were collected from Beauchamp's truck, residence, and the storage facility he rented. Dec. 16, 2011 Tr. 6–7. He also asserted that it was possible that the cigarette butts collected from his vehicle and one he smoked at the police station could have been "mixed up" with the cigarette butts found at the crime scene. *Id*. at 8. Additionally, Beauchamp contended

that trial counsel was ineffective for failing to argue that the chain of custody was compromised, when there was no chain of custody established for the cigarette butts. *Id*. at 6, 9.

In his second claim, Beauchamp alleged that trial counsel was ineffective when he failed to argue the importance of the evidence collection, chain of custody, and the disposal of some evidence by the State. Dec. 16, 2011 Tr. 9–12. Specifically, noting that one of the trash bags found on top of the victim contained a vehicle emissions notice that listed the name and address of another person, Beauchamp insisted that counsel should have investigated that evidence to see if that person was a possible suspect for the murder. *Id*. at 10. Beauchamp also argued that there were three witnesses his attorney should have called to testify at trial regarding the timing of when the trash at the crime scene appeared. According to Beauchamp, these three witnesses–Ms. Crambit, Ms. Roberto, and Mr. Oleke–would have testified that the trash pile did not exist until after the crime had been committed.

Beauchamp's second claim also challenged the destruction of trash bags that had been collected for processing, but were destroyed after Detective Massey returned from Ohio. *Id*. at 13. Beauchamp asserted that, at the time the evidence was destroyed, he did not have counsel to request that the trash bags be tested for evidence. *Id*.

Beauchamp's fourth claim was that the trial court abused its discretion by giving the jury an unwarranted flight instruction. Dec. 16, 2011 Tr. 16. According to Beauchamp, when Detective Massey questioned him, he was not told he was a witness or suspect, nor was he told he could not leave the state. Beauchamp argued that, when the prosecutor told the judge that "evidence was placed before the Defendant in a[n] interview" he was misleading the court for the purpose of allowing the instruction on flight. *Id*. at 17. He insisted that the DVD of

Detective Massey interviewing him shows that no evidence was laid out before him because at that time no evidence had been collected. *Id*.

In his fifth claim, Beauchamp noted that trial counsel questioned Detective Massey about whether the view for the Wal-Mart garden center entrance was reviewed, and contended that trial counsel was ineffective in failing to question the detective about whether he also reviewed the video surveillance from Wal-Mart depicting the other two entrances to the store as well as the inside of the store. Dec. 16, 2011 Tr. 18. In Beauchamp's view, his counsel should have asked Massey about why he reviewed the video from the Royal Farms store "to prove that Mr. Pearce was with the Defendant at the [Royal] Farm[s] store," but never checked the Wal-Mart in-store video to confirm that Pearce did not go to the Wal-Mart after the Royal Farms store. *Id*.

In addition to the claims raised by Beauchamp in his self-represented pleadings, post-conviction counsel for Beauchamp argued that the Sixth Amendment confrontation clause was violated twice during trial, but was not raised by trial counsel. Dec. 16, 2011 Tr. 32–34. The first instance involved the testimony of the medical examiner, who had not performed the autopsy, but relied instead on pictures of the body. The second instance involved the forensic chemist, who had not performed the DNA testing and could not state during cross-examination that proper procedures were used by the analyst who did perform the test. Additionally, post-conviction counsel asserted that trial counsel was ineffective for not arguing the motion for judgment of acquittal with particularity because failing to do so meant that the issue regarding sufficiency of the evidence was not preserved for appellate review. Dec. 16, 2011 Tr. 34.

Additionally, post-conviction counsel argued that trial counsel rendered ineffective assistance when he failed to object to various statements during the State's closing argument. *Id*. at 35–37.

Beauchamp's trial counsel, James R. Dills, testified at the post-conviction hearing. Dec. 16, 2011 Tr. 21–31. Dills explained that he had worked for fifteen years with the Office of the Public Defender and had handled approximately eight murder trials. *Id*. at 22. He recalled the importance of the cigarette butt evidence at trial and explained that he consulted "experts" on the DNA evidence, and they advised him to focus his cross-examination of the State's expert witness on the fact that the tests could not establish how long the DNA has been on the cigarette butt. *Id*. at 23.

Dills also explained that his cross-examination of Detective Massey focused on the fact that much of the trash collected from the scene where Pearce's body was found was not tested. He explained his trial strategy with regard to the evidence collection and the failure to test it was that Massey performed a sloppy investigation. He further explained that he had discussed this strategy with Beauchamp and Dills stated he thought Beauchamp was agreeable to the strategy. *Id*. at 24. Dills also explained during his direct testimony that he called Billy Warren as a witness in an attempt to refute the State's theory regarding the time of death, which the State could not definitively establish at the time of trial. *Id*. at 26.

When Dills was cross-examined by post-conviction counsel he admitted that he could not recall whether he had an investigator look at the trash pile found at the scene of the crime; did not ask for fingerprint evidence on the trash bags; and did not remember if he had called any of the residents who lived near the crime scene. *Id*. at 28–29. When asked if he had done any investigation in preparation for the trial, Dills related that he hired an entomologist to consult on this case and advise on a viable approach with regard to testing of the maggots. *Id*. at 29. Dills did not reveal the content of the advice that the expert gave. *Id*.

Dills also recalled during his direct testimony that he was provided with video from approximately twelve camera angles from the Wal-Mart parking lot. That video footage, provided to him by the State, was the footage his law clerk reviewed and testified as to what he observed at trial. *Id*. at 26. On cross-examination, Dills could not recall if the video footage provided depicted the garden center entrance. *Id*. at 30. Dills admitted that his law clerk did not go out to the Wal-Mart to verify there was another entrance into the store, but stated that he had done so himself. *Id*.

Dills could not recall whether he raised an objection during the State's closing argument, but explained that his trial strategy is to lodge objections during closing very reluctantly because "it basically either looks like I'm hiding something or . . . it kind of amplifies what was said" to the jurors. *Id*. at 27. Dills admitted during cross-examination that he could have raised an objection to the State's closing arguments at bench outside of the jury's hearing. *Id*. at 30–31.

The Circuit Court for Baltimore County denied the petition for post-conviction relief in an opinion and order dated December 21, 2011. Post-Conviction Op. 2–3. Petitioner, proceeding *pro se*, before the court even issued its order, filed a multi-issue application for leave to appeal the circuit court's denial of his post-conviction petition. *Pro Se* App. for Leave to Appeal Denial of Post-Conviction Relief, Resp. Ex. 7, ECF No. 3-7. Relevantly, he claimed that his right to confront witnesses was violated; that the State "did not present [the] Trial Court with Documentation to account for the continuous whereabouts of evidence from time seized until offered into evidence at Trial of which [Beauchamp] was entitled"; that the trial court erred by giving a jury instruction on flight; and trial counsel rendered ineffective assistance by failing to investigate the case and call certain defense witnesses. *Id.* at 2, 5-6. Then, represented by counsel, he filed an application for leave to appeal the denial of post-conviction relief, asserting

the following claims: "the post-conviction court erred by concluding that [Beauchamp] waived the allegation that his trial counsel rendered ineffective assistance by failure to object to a jury instruction"; "the post-conviction court erred by concluding that [Beauchamp] was not denied his Sixth Amendment right to confront the witnesses against him"; trial counsel was ineffective for failing to preserve the purported Six Amendment violation for appeal; and trial counsel rendered ineffective assistance by failing to object to the jury instruction on flight. App. for Leave to Appeal Denial of Post-Conviction Relief 8, 12, 17–18, Resp. Ex. 8, ECF No. 3-8. Notably, neither application included a claim that the State destroyed exculpatory evidence, in violation of Beauchamp's federal constitutional rights. In an unreported opinion filed on February 21, 2014, the Court of Special Appeals summarily denied the application for leave to appeal; the mandate issued on March 24, 2014. *Beauchamp v. Maryland*, No. 2402 (Md. Ct. Spec. App. Feb. 21, 2014) (per curiam) (unreported), Resp. Ex. 9, ECF No. 3-9.

Claims Raised in this Court

In this Court, Beauchamp asserts the following claims: (1) [A][6] the State destroyed exculpatory evidence, in violation of his federal constitutional rights; (2A) [E] his right to confront witnesses was violated; (2B) [B] the cigarette butt admitted into evidence "was not in the same condition as when collected from crime scene," as "shown by the DVD of the crime scene," and therefore it was improperly admitted; (3) [C] the post-conviction court and Court of Special Appeals erred by concluding that he waived his claim that "his trial counsel rendered ineffective assistance by failure to object to a jury instruction"; (4) [D2] trial counsel rendered ineffective assistance by failing to preserve the confrontation issue and the jury instruction issue

[6] Petitioner refers to his claims by number; Respondents reorder the claims and refer to them by letter. For ease of reference, I include the letters that Respondents use in brackets.

for appeal; (5) [D1] trial counsel rendered ineffective assistance by failing to investigate the case and call certain defense witnesses. Habeas Pet.; Resp.

As previously noted, Respondents assert that Beauchamp has not properly exhausted all of the claims raised, requiring dismissal of the petition. Resp. 11-12. After the Court advised Beauchamp of the legal significance of Respondents' allegation, he made several conflicting filings, seeking withdrawal of unexhausted claims, stay and abeyance pending exhaustion, and asserting the claims have been exhausted. This Court denied without prejudice Beauchamp's Motion for Stay and Abeyance pending supplementation of the record by Respondents. Feb. 20, 2015 Order. Since that Order was issued, Beauchamp has filed a Reply and Response, asserting that his claims are exhausted and that this Court should not dismiss the petition if it would deny him the opportunity to seek federal habeas relief. For the reasons set forth below, I find that the claims Beauchamp asserts, to the extent they are exhausted, are without merit and do not state a basis for federal habeas relief.

**Exhaustion**

As a matter of comity, a federal habeas petitioner generally must exhaust claims in state court; failure to exhaust a claim requires dismissal by the federal court. *See* 28 U.S.C. § 2254(b)(1)(A); *Granberry v. Greer*, 481 U.S. 129, 134 (1987); *Rose v. Lundy,* 455 U.S. 509, 515-19 (1982). The exhaustion requirement is satisfied when (1) a petitioner has fairly presented all claims in state court, or (2) if no state remedies are currently available to the petitioner. *See Gray v. Netherland*, 518 U.S. 152, 161 (1996). Fair presentation requires the petitioner to "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process," through either direct or collateral review. *O'Sullivan v. Boerckel*, 526 U.S. 838, 844–45 (1999). Both the operative facts

and the controlling legal principles must be presented to the state court. *Picard v. Connor,* 404 U.S. 270, 277 (1971).

To exhaust a claim on direct appeal in non-capital cases, it must be raised in an appeal, if one is permitted, to the Maryland Court of Special Appeals and then to the Maryland Court of Appeals by way of a petition for writ of certiorari. *See* Md. Code Ann., Cts. & Jud. Proc. § 12-201 and § 12-301. If the Court of Special Appeals denies the application, there is no further review available and the claim is exhausted. Cts. & Jud. Proc. § 12-202. But, if the application is granted and relief on the merits of the claim is denied, the petitioner must file a petition for writ of certiorari to the Court of Appeals. *See Williams v. State*, 438 A.2d 1301, 1305 (Md. 1981).

Here, Beauchamp filed an appeal to the Maryland Court of Special Appeals, which considered his claims but affirmed the trial court and denied him the relief he sought. *See Beauchamp*, No. 2390. Beauchamp did not petition the Court of Appeals for writ of certiorari. Therefore, he did not exhaust his claims on direct appeal. *See O'Sullivan*, 526 U.S. at 844–45; *Williams*, 438 A.2d at 1305.

As noted, he also could exhaust his claims through post-conviction proceedings. To do so, he had to raise his claims in a petition filed in the state circuit court *and* in an application for leave to appeal to the Court of Special Appeals. *See* Md. Code Ann., Crim. Proc. § 7-109; *see also O'Sullivan*, 526 U.S. at 845. If the Court of Special Appeals denies the application, there is no further review available and the claim is exhausted. *See* Cts. & Jud. Proc. § 12-202.

Beauchamp raised various claims before the circuit court in his post-conviction proceedings, Post-Conviction Op. 2–3, and he filed two applications for leave to appeal to the Court of Special Appeals, one with counsel and one *pro se*. The applications covered most of the issues raised in his habeas petition. The Court of Special Appeals denied his applications,

*Beauchamp*, No. 2402, and therefore the claims raised before it are exhausted. Cts. & Jud. Proc. § 12-202; *see also O'Sullivan*, 526 U.S. at 845. However, one of the issues raised in this Court did not appear in either application. Specifically, Beauchamp did not claim in his application that the State destroyed exculpatory evidence in violation of his federal constitutional rights. This claim is unexhausted.

**Standard of Review**

An application for writ of habeas corpus may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). The federal habeas statute at 28 U.S.C. § 2254 sets forth a "highly deferential standard for evaluating state-court rulings." *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997); *see also Bell v. Cone*, 543 U.S. 447 (2005). The standard is "difficult to meet," and requires courts to give state-court decisions the benefit of the doubt. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citations omitted); *see also White v Woodall*, ––– U.S. –––, –––, 134 S. Ct 1697, 1702 (2014) ("[A] state prisoner must show that the state court's ruling on claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement." (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits: 1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States"; or 2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state adjudication is contrary to clearly established federal law under § 2254(d)(1) where the state

court 1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or 2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

The Antiterrorism and Effective Death Penalty Act (AEDPA) erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court. Under the "unreasonable application" analysis under 2254(d)(1), "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103; *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). Thus, "an unreasonable application of federal law is different from an incorrect application of federal law." *Williams v. Taylor*, 529 U.S. 362, 410 (2000). "If this standard is difficult to meet"—and it is—"that is because it was meant to be." *Harrington*, 562 U.S. at 102. A federal court reviewing a habeas petition will not lightly conclude that a State's criminal justice system has experienced the "extreme malfunctio[n]" for which federal habeas relief is the remedy. *Id.* (internal quotation marks omitted).

Further, under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "[E]ven if reasonable minds reviewing the record might disagree about the finding in question," a federal habeas court may not conclude that the state court decision was based on an unreasonable determination of the facts. *Id*. "[A] federal habeas court may not issue the writ simply because [it] concludes in its independent

judgment that the relevant state-court decision applied established federal law erroneously or incorrectly." *Renico v. Lett*, 559 U.S 766, 773 (2010).

The habeas statute provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part." *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010). This is especially true where state courts have "resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)." *Id*. at 379.

When a petitioner alleges a claim of ineffective assistance of counsel, he must show both that counsel's performance was deficient and that the deficient performance prejudiced his defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). The second prong requires the Court to consider whether there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (citation omitted). This presumption is so strong that a petitioner alleging ineffective assistance of counsel must show that the proceeding was rendered "fundamentally unfair" by counsel's affirmative omissions or errors. *Id*. at 696.

**Analysis**

1. *Beauchamp's claim that the State destroyed exculpatory evidence, in violation of his federal constitutional rights*

On direct appeal, Beauchamp asked the Maryland Court of Special Appeals to address whether "possibly exculpatory evidence [was] destroyed by the state without testing in violation of appellant's due process right," Br. for Appellant 2, and "[s]pecifically . . . claim[ed] that the State should have extensively tested or preserved such items as a folding knife and blankets found at the scene of Pearce's murder and maggots found on Pearce's body." *Beauchamp*, No. 2390, at 12. The appellate court rejected the claim because Beauchamp did not "show that the State destroyed possibly relevant evidence in 'bad faith,'" as required by *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988), which held that a criminal defendant must show bad faith on the part of police when evidence was destroyed in order to establish a violation of due process. *Id*. at 12-13. Beauchamp failed to exhaust this claim because he did not present it to the State's highest court, and he did not raise it in post-conviction court. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 844–45 (1999); *Williams v. State*, 438 A.2d 1301, 1305 (Md. 1981). Moreover, the State appellate court's analysis is without error and does not constitute an unreasonable application of well-established federal law.

To the extent Beauchamp may claim in this proceeding that the State violated his constitutional rights by destroying other exculpatory evidence, such as trash with names and addresses of individuals on it, that claim also is unexhausted, as it was not raised on appeal or in post-conviction court. Additionally, it does not merit stay and abeyance, as Beauchamp has not shown that the trash was destroyed in bad faith. *See Rhines v. Weber*, 544 U.S. 269, 277 (2005) (noting that stay and abeyance only is appropriate with regard to an unexhausted claim when it is meritorious and "the district court determines there was good cause for the petitioner's failure to

exhaust his claims first in state court"). Rather, Officer Kreitz testified that the trash collected at the scene was discarded as irrelevant because Beauchamp had been identified as a suspect and it had no connection to him or Pearce. Sept. 5, 2008 Tr. 40–42, Supp. Answer Ex. 14; *see also* Sept. 3, 2008 Tr. 160–74. Moreover, review of the trial transcript makes clear that defense counsel knew about the content of the trash and used the information for purposes of cross-examination. Dec. 16, 2011 Tr. 23–24. Therefore, I will dismiss this claim in its entirety. *See George v. Angelone*, 100 F.3d 353, 364 n.14 (4th Cir. 1996) ("[W]hen it is clear that an unexhausted claim asserted by a state habeas petitioner lacks merit, federal habeas court should dismiss the claim on the merits.").

2. *Beauchamp's claim that the cigarette butt admitted into evidence "was not in the same condition as when collected from crime scene," as "shown by the DVD of the crime scene," and therefore it was improperly admitted*

As noted, this claim appears to have two components. Petitioner appears to claim that the cigarette was improperly admitted because the chain of custody was broken, the cigarette was tampered with, and it was in a different condition at trial than at the crime scene. It also appears that he claims that the DNA evidence obtained from the cigarette butt was inadmissible because "those who . . . tested for DNA" did not testify.

Beauchamp has admitted that this claim was not exhausted but also has asserted it has been exhausted. In his claim that it was not raised on appeal of the post-conviction court's decision, Beauchamp asserts that failure is excusable because he was not made aware that the DVD containing video footage of the crime scene and the cigarette butts were available at the court during his post-conviction hearing. He assigns error to post-conviction counsel's failure to ascertain that the evidence was at the courthouse and for failing to present it to the post-conviction court. Pet.'s Supp. 1–3, ECF No. 10; Pet.'s Resp. to Mem. Op. Beauchamp does not

offer any argument as to how presentation of that evidence to the post-conviction court would have established trial counsel was ineffective or that some misconduct took place regarding the processing of evidence. Moreover, the evidence in question was presented at trial for the jury's review and defense counsel repeatedly stressed that the State had no evidence to establish how long the cigarette butt had been at the scene or how old the DNA found on it was.

An aspect of this claim was in fact presented to the post-conviction court when Beauchamp alleged that trial counsel was ineffective for failing to point out that none of the reports regarding the cigarette butts tested stated what brand they were despite the fact that empty cigarette boxes had been collected from inside Beauchamp's truck and at his residence. Dec. 16, 2011 Tr. 6. The post-conviction court addressed this claims as follows:

> [Beauchamp] appears to argue that counsel was ineffective for not establishing that the cigarette at the scene was not the Basic brand that [he] usually smoked. Regardless of the brand, the State established that [Beauchamp's] DNA was on the cigarette. Defense counsel instead raised doubts through cross-examination about *when* the cigarette arrived at the crime scene; it was not found until the second day that police examined the scene.

Post-Conviction Op. 6–7. The post-conviction court then stated that trial counsel "will not be deemed to have rendered ineffective assistance for failing to do frivolous, improper, useless or impossible actions." *Id*. at 7. The post-conviction court's analysis is without error and also lays to rest any claim that Beauchamp's lack of awareness that the evidence was available at the courthouse during the post-conviction hearing somehow impacted on the proper analysis of the claim. As the post-conviction court correctly observed, "even if counsel had established the brand was not [Beauchamp's] usual brand, the DNA evidence still linked [him] to the butt." *Id*. Additionally, the portion of Beauchamp's claim that implied police tampered with evidence was rejected by the post-conviction court under the "finally litigated rule." *Id.* Under Maryland law, Beauchamp was precluded from raising such an issue at post-conviction because on direct appeal

the Court of [Special] Appeals found he had failed to prove or allege that police had acted in bad faith in failing to preserve potentially exculpatory evidence. *Id*. (citing Md. Code Ann., Crim. Proc. § 7-106(a)). The claim is without merit and the post-conviction court's analysis is a reasoned application of federal law with regard to the ineffective assistance of counsel claim and states an adequate state law basis for rejecting the remaining part of the claim.

*3. Beauchamp's claims regarding the jury instruction on flight*

The trial court instructed the jury on flight as follows:

> A person's flight or concealment immediately after the commission of a crime or after being accused of a crime is not enough by itself to establish guilt, but it is a fact that may be considered by you as evidence of guilt. Flight or concealment under these circumstances may be motivated by a variety of factors, some of which are fully consistent with innocence. You must first decide whether there is evidence of flight or concealment. If you decide that there is evidence of flight or concealment, you then must decide whether this flight or concealment shows a consciousness of guilt.

Post-Conviction Op. 9 n.1. At trial, Defense counsel objected to this instruction. Sept. 5, 2008 Tr. 126–27. Before the post-conviction court, Beauchamp argued that the trial court abused its discretion in giving the instruction. Post-Conviction Op. 9. The post-conviction court erroneously stated that counsel failed to object to the flight instruction and, applying Maryland law, found that counsel's failure to object "effect[ed] a waiver of the right to complain about it in a post-conviction case." *Id.*

Beauchamp now claims that the post-conviction court and Court of Special Appeals erred by concluding that he waived his claim that "his *trial counsel* rendered ineffective assistance by failure to object to a jury instruction," and that trial counsel rendered ineffective assistance by failing to preserve the jury instruction issue for appeal. App. for Leave to Appeal Denial of Post-Conviction Relief 8 (emphasis added). As noted, Beauchamp did not exhaust the claims he presented to the Court of Special Appeals because he did not present them to the Court of

Appeals. And, before the post-conviction court, he argued that the *trial court* abused its discretion in giving this instruction, not that *his trial counsel* erred in failing to object. *See* Post-Conviction Op. 2–3; Dec. 16, 2011 Tr. 16. Moreover, the trial transcript shows that trial counsel did object to the instruction. Further, in ruling on counsel's objection, the trial court noted that the facts produced at trial supported the instruction, and that criminal charges did not have to have been lodged against a defendant before he fled the jurisdiction for the instruction to be warranted. Sept. 5, 2008 Tr. 114, 126–28. Consequently, Beauchamp cannot prevail on this ineffective assistance of counsel claim, and a stay and abeyance is not warranted. *See Rhines v. Weber*, 544 U.S. 269, 277 (2005) (stay is available only in limited circumstances, and is appropriate only for good cause, where the unexhausted claims are potentially meritorious and no dilatory tactics are shown).

*4. Beauchamp's claim that trial counsel rendered ineffective assistance by failing to investigate the case and call certain defense witnesses*

Beauchamp claims that trial counsel should have investigated evidence found in some of the trash bags to determine whether the State should have investigated other individuals as suspects for the murder and that trial counsel should have interviewed residents of Todds Lane who initially found Pearce's body and with whom the police had spoken. Beauchamp presented this claims at the post-conviction hearing, Dec. 16, 2011 Tr. 9–12, but the post-conviction court did not specifically address them in its decision denying relief. Post-Conviction Op. Beauchamp also raised this claim in his *pro se* application for leave to appeal the denial of post-conviction relief. *Pro Se* App. for Leave to Appeal Denial of Post-Conviction Relief 8–9. The claim is exhausted as Beauchamp has given "the state courts an opportunity to act on his claims before he present[ed] those claims to [this court] in a habeas petition." *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). "[D]etermining whether a state court's decision resulted from an unreasonable

legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). This claim has no merit and presumably was rejected on that basis by the state court.

First, trial counsel brought out the fact that pieces of mail with names and addresses of other people were found in the trash bags near the body and that police did not investigate those people. The jury was aware of those facts and counsel's performance was not deficient in this regard.

Second, the three witnesses Beauchamp names did not provide police with conflicting evidence regarding the existence of the trash pile at the time of the murder. Evidence produced at trial established that Pearce's body was under a mattress and several bags of trash. The three witnesses verified in police interviews that the body was difficult to see because it was underneath a mattress and they could not see it until a bag of trash was moved. Habeas Pet. Ex. 1B. None of the statements provided by Cramblitt, Oelke, or Roberto included a statement that there was no trash at the site until sometime after the alleged time of the murder. Rather, Cramblitt told police she first observed the trash five days prior to the date the body was found, the date Pearce was reported missing, at 6:30 in the evening. *Id.* Pearce was reported missing at 11 a.m. the same day; in Beauchamp's view, it "would have been impossible" for him to kill Pearce and leave him under the trash because Cramblitt did not observe the trash until more than seven hours later. But this evidence does not establish that the trash could not have been there earlier or that Beauchamp could not have placed Pearce's body under the trash after 6:30 p.m.

Roberto's testimony that she saw a white pick-up truck in the area that was full of trash bags on the Tuesday following the murder is of no evidentiary value. Earl Davies testified at trial that he and Cramblitt went over to the trash pile to go through it "when the pile got bigger"

and stated that prior to that time there were "a couple trash bags sitting there tied up. Nothing not normal for around there." Sept. 2, 2008 Tr. 147, Supp. Answer Ex. 11. On cross-examination Davies testified that there is frequently trash dumped on the side of the road in various places and that "[p]eople go there and throw stuff away because they know they can do it without being seen." *Id*. at 148. On redirect, Davies testified that there were other piles of trash fifteen to twenty feet down the road on the opposite side. *Id*. at 149. Thus, any testimony that trash had been dumped on the same road after the alleged time of the murder does not exonerate Beauchamp.

Trial counsel is not deficient where, as here, the proposed testimony of the witnesses would not impact on the result of the trial nor call into question the validity of the verdict. Under *Strickland* there must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). The failure to initiate an investigation into other people unconnected to the victim and to present testimony that would not have exonerated Beauchamp, does not establish that there was an unprofessional error, nor is there even a remote possibility that the result of the trial would have been different had the investigation been made. *See Horne v. Peyton*, 356 F.2d 631 (4th Cir. 1966) (fact that counsel could have done more is insufficient for reversal absent any showing of harmful consequences).

5. *Beauchamp's claims that his right to confront witnesses was violated and trial counsel rendered ineffective assistance by failing to preserve the confrontation issue for appeal*

The "confrontation issue" concerns the claim that trial counsel was ineffective for failing to object to the testimony of two witnesses for the State who were not the individuals who actually performed the autopsy and the DNA tests. In presenting this claim to the post-conviction court, post-conviction counsel relied on *Crawford v. Washington*, 541 U.S. 36 (2004);

*Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009); and *Bullcoming v. New Mexico*, 564 U.S. 647 (2011), to argue that Beauchamp had the right to confront the person who analyzed the evidence, his right was denied, and trial counsel failed to object. Dec. 16, 2011 Tr. 32–33. The post-conviction court rejected this claim and noted that "the Supreme Court did not address how [*Crawford*] applied" to cross-examination of the actual persons who examined and tested evidence until the decision in *Melendez-Diaz*, and Maryland did not make the *Crawford* and *Melendez-Diaz* holdings applicable until two months prior to the post-conviction court's decision. Post-Conviction Op. 14. The court noted that "defense counsel could not have been expected to be prescient about how the law in a case involving police testimonial statements would be directly applied to autopsy or forensic reports." *Id*. The post-conviction court concluded that counsel's performance was not deficient and that the claim failed. The analysis is without error as *Crawford* and its progeny have no retroactive application to cases on collateral review. *See Whorton v. Bockting*, 549 U.S. 406, 416–17, 421 (2007) ("*Crawford* announced a 'new rule' of criminal procedure" but not "a '"watershed rul[e] of criminal procedure" implicating the fundamental fairness and accuracy of the criminal proceeding'" and therefore the rule from *Crawford* cannot be applied retroactively on collateral review). This analysis also applies to Beauchamp's claim that his right to confront witnesses against him was violated.

## Conclusion

Having reviewed the Petition for Writ of Habeas Corpus, the Response along with the exhibits submitted, Beauchamp's Reply, and the parties' additional filings, this Court determines that Beauchamp is not entitled to federal habeas relief. There is no basis upon which to find constitutional deficiencies in the state court proceedings, as Beauchamp failed to rebut the

presumption of correctness of the findings of fact underlying the rejection of his grounds for post-conviction or appellate relief.

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U. S.C. § 2253(c)(2). The petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke,* 542 U.S. 274, 282 (2004) (citation and internal quotation marks omitted), or that "the issues presented are adequate to deserve encouragement to proceed further," *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Because this Court finds that there has been no substantial showing of the denial of a constitutional right, a certificate of appealability shall be denied. *See* 28 U. S.C. § 2253(c)(2).

A separate order follows.

November 18, 2016
Date

/S/
Paul W. Grimm
United States District Judge